When everybody gets settled, the appellant can get started. Good afternoon, your honors. May it please the court, life overruled with the Department of Justice, on behalf of the government. This case involves a set of challenges to the department's implementation of the No Surprises Act governing medical billing to protect patients against the potentially crippling effects of surprise medical bills. Several of the challenges here concern the methodology the department has adopted to calculate the so-called qualifying payment amount, or QPA, so I'd like to start there. To protect patients against surprise medical bills, the No Surprises Act both caps the amount of the liability patients may face for covered services, and it sets up procedures to allow providers to obtain additional compensation from the patient's health plans. The QPA is designed as a proxy for the amount that a provider may receive if it were in a health plans network for a particular service, and the Act sets up certain key points for how the QPA should be calculated, saying that it should be the median of the contracted rates for a particular service, looking at the total maximum amount and the rates charged by providers in the same or similar specialty and the same geographic region as the service for which the QPA is being calculated. At the same time, the statute also expressly delegates to the departments the authority to fill out the details of this methodology, and they reasonably exercise that expressly delegated authority here, adopting a workable methodology that looks to the rates on the face of the plans contracted with providers as of the statutorily specified date, January 31, 2019. As a result, each of the three challenges to that methodology, additional and appeal,  To start with what I would call the contracted rates issue, the department reasonably determined that this calculation should be based on the rates that appear on the face of the contracts without conducting some sort of separate inquiry into whether any number of claims have been paid at that rate. That follows from the text, the structure, and the purpose of the statute here. Textually, the statute looks to contracted rates. It doesn't have some separate inquiry into whether a claim has been paid at that rate. And it asks the insurers calculating the QPAs to make this calculation based on the snapshot in time, the January 31, 2019 date that the statute sets out. Neither the district court's opinion below nor my friends have any answer what you're supposed to do with that date if you accept their position that it requires some sort of additional inquiry into whether a claim has been paid at that rate. The statute, the date, you can easily look at what the contracts say as of that date. There's no similar guidance about under what period a claim is supposed to be paid or not, or any sort of statutory guidance about how that aspect of the district court's decision here is supposed to be implemented. This is also a workable approach that, again, focuses on the face of the contracts completely in contrast to the approach reflected in the district court's opinion where plans have to look at their claims data. They only have the data of a particular plan and not the data of any other insurer for which a rate might or might not have been paid for a particular service. I do think that plaintiffs are probably concerned about distortions that can arise from pricing that's not really legitimate. It does seem to me the government's taking a position that if the price for a particular service that's relevant to this calculation is $0, that can be ignored, correct? Well, the $0, the department's explained, that's not a rate. Okay, understood, but is there any evidence in this record of other ways that providers who don't really provide much of that service would put a dollar figure? They're not terribly concerned about it, they're not going to provide much. Are there any other distortive, if you're going to ignore the $0, that probably makes sense, I'm not making a ruling from the bench, but that probably makes sense. But is there any other evidence of how providers that all can provide a service meaningfully to any degree, how they might put something other than $0? Well, I mean, what the department's addressed in the August 2022 guidance is you might get a situation in which an anesthesiologist, for example, has some rate in the contract for dermatology services, but that's addressed by the requirement to calculate the QPA separately for each provider in the same or similar specialty. You're not going to include, I don't think, I'm not sure dermatology services are going to be one of the situations in which you might get a surprise medical bill necessarily, but you wouldn't get the anesthesiologist rates for dermatology or vice versa. So that is addressed by that requirement. And I just, there's nothing in the text of the statute that requires some sort of additional inquiry to address that policy concern. I mean, the requirement is not, as my friends sort of shorthand it, an is-provided requirement. There's no is-provided requirement in the statute, there's a requirement to base it on the rates of a service provided by a provider in the same or similar specialty and the same geographic region as the service for which you're calculating the QPA. And then, I would just, on the second issue, the case-specific agreements issue, thereto the text, the fact that there's this statutorily specified date, and the purpose behind the No Surprises Act all counsel strongly in favor of the department's interpretation and against the plaintiff's interpretation here. Texturally, when you have this sort of one-off agreement to resolve the price paid for a That's not, that doesn't fall under the natural understanding of a rate when it's concededly for service that is out of network. That's not a rate under a particular plan. I want to turn to this issue of the 30 calendar days after the bill. What is your definition of the term bill? I mean, I think bill in the medical context has the sort of information that you need to decide whether or not to pay that claim for payments in the medical context. I think that's entirely unsurprising that a bill looks differently when you're getting it from a doctor versus the bill you might get at a restaurant, the bill a lawyer might send a client. In each case, it contains the information necessary to decide whether or not to make a claim for, that claim for payment should be accepted. So the department's interpretation here, looking at the information necessary to decide the claim for payment, I think neatly tracks. What does that mean? Is there anywhere in the rule that explains what is information to decide a claim? It doesn't explain that in the rule. I mean, this does sort of track the practice of using clean claims in the medical context. I think there is sort of a established industry understanding for the types of information you would need to decide the claim for payment. What are we to take from the fact that they didn't use the term clean claim in the statute? Well, I think, I mean, if you look at the times in which Congress has used specifically the statute of clean claim in other statutes, it does have certain aspects that the claim had no defect, for example, that is not present in the department's interpretation here. So it's not exactly the way it has been used in certain other statutes. And I just think when you think about a bill for such services in the medical context in particular, it just, it has the features of what you expect a medical bill to look like. But if Congress wanted to do that, they know how to do that. They could explain the bill differently than what we all understand. Oh my gosh, I just got a bill. Why wouldn't they use something different or explain it more if they didn't mean what everybody understands to be a bill? Well, I just, when you say bill for such services in the statute about medical billing, I think the most natural way to understand that is it's the sort of bill you would expect from a medical provider sending to a plan. I don't think they have to use the more specific term to get that most natural meaning. And if you think about the sort of dictionary definition that the district court offered, where it's just sort of an itemized list of services, that's really just not a workable definition in the medical billing context. That's not . . . I mean, have you never had a doctor write you and say, you came in last week, please send $100? The bills that I've personally got have had more details about the code, the time in which service was provided. And I think similarly, when it's an insurer getting the bill, they expect the sort of thing in the bill to have the information they need to decide the . . . Counsel, you seem to be importing, and I'm not saying improperly, but I want you to support it if it's so, normal trade practices, if I can refer to medical profession as a trade and I shouldn't. Isn't that really what you're arguing, that plans and medical providers sort of have an understanding of how this works? And when we say bill, we mean something different than perhaps the three members of this court might think of when we think of medical bills. Is this an issue of how this works in the industry, and you're importing that into this analysis? I think the departments appropriately look to the industry practice. I mean, I think the City of Dallas case, for example, suggests, I mean, that's an ordinary way in which we interpret statutes. So I think, you know, taking . . . You're really saying it's the wrong dictionaries. The district court used the wrong dictionaries. They need . . . and it wouldn't be literally a dictionary. He needed to be looking at something different. Well, I think, I mean, just the ordinary understanding of bill, we expect a different bill in different contexts. And I think you expect it to have . . . you know, I think it's not just sufficient to get a list of services even, you know, in a restaurant context. You expect to have the basis on which you're supposed to know whether to pay the bill or not. So I think it is the ordinary understanding of bill in this particular industry context. Is there a law that says that doctors have to do more than just say, thank you for coming in last week on, you know, August whatever, please pay $100? Well, so there are a number of state law clean claim requirements that do not obviously directly apply in this context, but that do, as a state law matter, I think, import some of these same requirements in order to trigger requirements on the timing on which a bill has to be paid or not. But is there something Congress could have relied upon? Oh, when we use the word bill in medical, everybody will know to look at X and that'll tell them. Is there anything like that? You know, they could have used maybe an even clearer phrasing, but I don't think that avoids giving the natural understanding to the terms that they did use. Okay, but I mean, we don't tend to just run around changing words that the Congress has  Sure. We're supposed to follow what they say. Absolutely. Okay, and so what, like I'm saying, what does Congress have in their bucket that says, oh, doctors can't just send out a bill, they got to send out a heck of a lot more for anybody to pay? I'm sorry, you're saying what else could Congress have said? What else do they have? I mean, you're saying that that's just known. So I'm saying what statute, what, what document in Congress tells them that? Because if you say, well, some states have that, okay, but there's 50 states, they're all different. That isn't what Congress relies on unless they say so. Rely on your state's rule about bill. They don't say that. So I'm just a little confused about what you're relying on. We're just relying on the sort of ordinary principles of statutory interpretation reflected in the city of Dallas case, that if you're using a term in a statute addressed to a particular industry, you import the sort of industry understandings of that term, particularly in a situation in which not giving the term that that understanding creates a situation in which a plan might receive a piece of paper that is ostensibly a bill, but that does not actually have the information required to determine whether or not this is a claim that should be paid or not. You have the potential for a denial that leads to confusion about whether something's actually covered by the No Surprises Act in the first place, and just starting a set of procedures without the actual basis to determine whether or not a claim should be paid. So why didn't the district court think you were right on that? I think the district court looked to sort of dictionary definitions of bill for such services without sort of giving appropriate weight to the particular context in which the term is used here. And I think, I mean, that's true with some of the QPA calculation issues as well. When you view them in the context of the statute as a whole, the purpose that it's supposed to serve to both protect against surprise medical billing and ensure that generally when patients receive services like this, they're paying essentially the amounts that they would pay if they were receiving it in-network, that context sort of informs the terms that Congress used and its choice to delegate rulemaking authority. So you're saying bill is going to be different in a bunch of different statutes? I mean, I don't know, I have not looked through the U.S. Code how often Congress has said bill for such services, but certainly to the extent bills look different in different industries, it would be appropriate to sort of take that into account in interpreting that term when Congress uses it. What's your best case on that point? I think it is the city of Dallas. I mean, that's the... Okay. Yeah. You think that case supports what you just said?  That's your best argument? Yes. Let me take you back to case-specific agreements. You didn't linger on that very long. You were moved ahead. To what extent is your argument strictly a textual argument, that when you look at the part that you can probably say off the top of your head, I got it written down here, but when you look at that language, is the language itself enough in this case to hold for you? I think so, Your Honor. What language in there do you think is particularly important? It's the ordinary understanding of what a rate is, and particularly a rate under a plan, under a health plan. A rate, as we noted, generally involves applying a set amount to a set of similar circumstances. My friends say that we've cherry-picked the definition, but if you look, that is the definition the dictionary says is the most common understanding of that term. And then particularly when you're thinking about a rate recognized under a plan, that naturally encompasses the rates the plan has agreed to with providers to govern all sort of claims under it, and not these sort of conceitedly out-of-network claims for one-off kind of agreements like this. All right, counsel. Thank you. Good afternoon, Your Honors, and may it please the Court. Eric MacArthur for the TMA Plaintiffs. I will be addressing the three issues raised in the TMA brief, that's ghost rates, bonus payments, and the disclosure rule. Then Mr. Shackelford will address the additional issues raised in the Air Ambulance Plaintiffs brief concerning single-case agreements and the initial payment deadline. Background question. The August decision, Texas Medical Association, I've seen referred to as TMA number five. Is this number six or more? By my nomenclature, it's TMA number three. Okay. It was the third case that we brought. Before I turn to the specific issues, I do want to take just a moment and step back and emphasize what this case is about. It may be a technical-sounding dispute about how you calculate the QPA, but the case is really about whether the departments must follow the instructions that Congress gave them in a central provision of the Act that will permanently affect whether healthcare providers are fairly compensated for their services. I say permanently affect because you have to remember, under this statute, QPAs are supposed to be calculated only once at the outset of this statute based on the 2019 contracted rates. After that, in future years, they are adjusted only for inflation. And so it is critically important that these metrics be calculated correctly in compliance with the statute. We brought this lawsuit because the department's rules do the opposite. They ensure that QPAs will be calculated incorrectly in violation of the statute, and they consistently depress QPAs below negotiated market rates, contrary to the department's own understanding of Congress's intent with regard to this QPA methodology. And there's no better example of that than the first issue to which I will turn, which is what we've called ghost rates. I want to start out just by clearing out a bit of underbrush because the briefs on the other side, in this case, have tried to make this issue about frequency, about how often the provider provides the service. That is not the issue. What we are talking about when we are talking about ghost rates is rates that appear in a contract with a provider for a service that that provider does not provide at all. Not a question of how often, at all. So how does... How will the government know that when it's looking at this and trying to calculate a QPA? How do you know it's not provided at all? Is it because, as I got into with opposing counsel, this says zero dollars? How can you tell from what is provided whether it's not... What is provided as information, whether that particular service will not be provided by that? Right. So you may not be able to tell from the face of the contract itself whether a particular provider provides the service. The insurers may need to do additional work, for example, by examining their own claims data to see whether the provider has provided the service. Because the way these rates get into the contracts is the insurers present the providers with what are, in essence, form contracts that has a preset schedule of rates for all of the services that the insurer covers. And then the providers will negotiate the rates for the services that they provide, but the contract that gets executed includes that fee schedule with all of the other rates for all of the other services that they don't provide. And those are contracted rates on the government's understanding of that term. Government's position in this case is you have to include those contracted rates even if the providers who agreed to them do not provide the relevant item or service under any understanding of that word. So even if the provider has never provided it, will never provide it, is not even qualified to provide it, would not provide it if asked. The department's position is those rates go into the QPA calculation. As Judge Kernodle recognized, that is plainly not a tenable interpretation of the statutory language because it reads the word provided out of the statute. I believe I heard my friend on the other side say this morning, this afternoon, that there's no textual basis for our position because there is no is provided requirement in the statute. He wants you to focus on the contracted rate part, and that is where the definition starts. It starts with the rate recognized by the insurer in the contract. But not every contracted rate goes into the QPA. That is the whole point of the clause that begins toward the end of the definition that says it must be for an item or service that is provided by a provider in the same or similar specialty and provided in the geographic region. So there are three requirements there. It's got to be provided by a provider in the same or similar specialty and in the geographic region. I take it they would concede that if the provider who agreed to the rate is not in the same specialty, that rate must be excluded. Same if the provider who agreed to the rate provides the service but not in the relevant geographic region. That rate also would have to be excluded, and I think my friend on the other side would concede that. Same thing for whether the service is provided at all. In fact, I think that the provided requirement is inherent in the geographic region requirement because if a provider does not provide a service at all, then the provider does not provide The provider could provide the service, but it's just kind of limited, and they didn't have anybody, but then tomorrow they do. Why would that be something thrown out? I understand the notion that if no one can provide it, but why is provider someone who has to have already done it, even if they're capable of doing it? So that's not our position. It's not a historical provision test. The question is whether they provide the service, and if they would provide it, if asked to provide it, that's a rate that should go into the QPA calculation methodology, as I understand the statutory text here.  Because it wasn't clear to me that that's what you all were saying. Right. And frankly, I don't think the Court actually has to go any farther than Judge Kernodle went here. I don't think you have to say exactly what provided requires and how would you go about establishing that. All you have to do to affirm Judge Kernodle is say what he said, which is the Department's interpretation under which the service doesn't have to be provided in any sense of the word is unlawful because it reads the word provided out of the statute. I would also like to address the issue of bonuses and incentive payments, and the key statutory term here is total maximum payment. The statute says that the rate that goes into the QPA must be the rate recognized by the insurer as the total maximum payment for the item or service at issue. Bonuses and incentive payments are part of the compensation that providers receive for the items and services that they provide, and so fall squarely within the plain meaning of the term total maximum payment, and excluding them artificially depresses QPAs because you are excluding part of the compensation that the provider is contracted to receive. Now, the principal justification the departments have given on appeal for their rule, which excludes all bonuses and incentive payments, is they say that those sorts of payments are rarely tied to a specific item or service. First point, that is a post hoc rationale. There's not a single word in the rule about how often bonus payments are tied to particular items and services. That is a factual representation being made in a litigation brief, and the court should disregard it. But more fundamentally, they do not deny that at least some bonuses and incentive payments are directly tied to items and services, and yet they have a rule that categorically excludes all bonuses and incentive payments. They don't even have a fig leaf of textual justification for excluding those bonuses and incentive payments, and that by itself is sufficient to make their rule unlawful and warrant setting it aside. But even if you go beyond that to talk about bonuses that aren't tied to particular items and services, they talk about quality-based bonuses that you may receive as a provider based on the quality of your services across all of the services that you provide. Even those bonuses are for the items and services that you render, and you don't just have to take my word for it. You can look at the department's own rule. So they have a rule as part of their disclosure provision that says an insurer has to disclose whether it excluded bonuses and incentive payments, and in that very rule, they describe the bonuses and incentive payments as for the items and services involved. That's a perfectly natural use of the English language. But it gets worse for the departments because even setting that point aside, Congress required the departments to take account of payments that are not on a fee-for-service basis. There's a provision in the statute that directly says that, that their rulemaking shall take account of payments that are not on a fee-for-service basis. They did that with respect to certain payments that are not on a fee-for-service basis, for example, capitation payments. Capitation payment is when the insurer agrees to pay a fixed amount per member per month to the provider, obviously not a payment that's tied directly to the provision of a specific item or service. Did the departments throw up their hands and say, because it's not tied to a particular item or service, it's not for the item or service, and therefore can't be included in the QPA methodology? No. They came up with a way to translate those payments into a fee-for-service number and included them in the QPA as Congress directed them to do. They should have done the same thing for bonuses and incentive payments. The only rationale they gave in the rule for excluding bonuses and incentive payments is they said, it's our understanding that that's not how patient cost-sharing is customarily calculated. I could understand that argument if the statutory term we were construing was cost-sharing, or even if this was a metric that was used only for patient cost-sharing purposes under this statute, but neither of those is the case. The relevant statutory term is total maximum payment, and that includes bonuses and incentive payments. And . . . I want to move you to the remedy in this case. There is some argument that it's required in the Fifth Circuit to vacate a rule that we find to violate the APA. What's your position of the proper remedy in this case, and how, if we agree that any part of what the rule says is incorrect and inconsistent with statute or whatever else, that it must be vacated? So I certainly agree that Judge Kernodle did not abuse his discretion in vacating these rules here. I think there is precedent that recognizes in rare circumstances that there may be a remand without vacater. I think that's in some tension with the text of the APA, which says, agency action found to be unlawful shall be set aside. But the Court has recognized in rare circumstances remand without vacater may be appropriate. But there are requirements to get that rare remedy that are not satisfied here. The first is there has to be a significant likelihood that the departments will be able to rehabilitate these rules on remand, and there is zero possibility of that here because the rules conflict with the unambiguous text of the statute. So that's a threshold requirement. You don't even have to ask about the second factor, which is, would vacating the rule have disruptive consequences? But even if you went on to consider the disruption here, there's no reason that vacating these rules needed to cause any disruption. As Judge Kernodle explained, the departments can exercise enforcement discretion until such time as insurers are able to calculate compliant QPAs, and that is exactly how the departments have proceeded. They point to a time period during which IDR was paused. Not clear to me that it was caused by TMA-3 as opposed to TMA-4. But even if so, that's over. Any disruption that was caused by the vacater has already run its course and is not a reason for, at this point, reinstating unlawful rules. All right, Counsel. Thank you. May it please the Court, Stephen Shackelford for LifeNet and East Texas Air One, arguing on behalf of all the air ambulance plaintiffs. I'll start off with the 30 calendar day requirement for the beginning of the entire negotiation process under the No Surprises Act. The district court had a very logical definition of the word bill out of the dictionary, and the government has never come up with an alternative definition of the word bill. The government has said, well, bill, you shouldn't consider something a bill unless you have all the information in there necessary for the insurer to make a payment determination. You talk about industry standards and what is necessary before any kind of decision can be made. You have to have sufficient information. What is the role of industry standards in this case? In a case like City of Dallas, Your Honor, industry standards, they look to that to literally find out the definition of a word. I think it was gross revenues, a phrase there. There's not an effort here to look to some specialized industry understanding for what a bill is. The understanding is what does it take before there can be a reaction to a bill, before we can determine what our obligations are under this bill. It does seem to me what happens after a bill is received very much requires that the recipient of that bill have enough information to react to it in a way consistent with what the statute requires. Well, for one thing, Your Honor, the statute here sets up a whole process for dealing with a bill like this if there are disputes over it, and the insurers are completely free to deny a claim and say we don't have sufficient information. The key for air ambulance plaintiffs in particular is that they need the process to start, and if the insurers claim they still don't have enough information to determine whether a particular transport is covered under their plan, they can make that argument to us in open negotiations. They can make that argument to the IDR, and we risk getting zero recovery if we don't actually supply the information. In fact, we are required to supply the relevant information in order to initiate the IDR process. So what is the fight over, really, on this 30-day requirement? Is it that if the bill hasn't started in 30 days, the whole process is just set back too long in time? Is that what the plaintiffs are worried about? As has happened in real life, it is set back often indefinitely. It goes 2, 3, 4, 5, 6 times the 30-day amount and longer, and we put in affidavits at the trial court. How does what you say is the proper way to proceed change that? Because under what the Congress wrote, when we submit a bill, which commonly understood as something saying, you owe us this money for this service, the 30-day calendar day clock starts. At the end of that 30 days, the insurer or the sponsor has to either pay us an initial payment or they have to provide a denial of payment, which allows us, only then are we allowed to start the open negotiation process and move down the NSA's road towards eventual payment of some amount or denial of payment altogether. If that road doesn't— You get into arbitration sooner. Or ever. I mean, conceivably, Your Honor— As far as if 30 days never starts, you don't move into that process. Precisely, Your Honor. And what the government has done— You may not get paid. And we'll never get paid, as has happened on many of the claims. That is the issue, right? Yes, Your Honor. We just want a decision. I guess the concept is that—I mean, you saw my questions to your opponent. Am I right that doctors do send out bills that say, you know, thank you for coming last week, please pay $100? It's the subject of conversation often with me and my wife, so we get those bills, Your  What the government has done is they've tried to turn from the phrase, the word bill, to the phrase clean claim. But Your Honor asks exactly the right question. If Congress is using the term bill, where else can we look in the U.S. Code for that? And the government doesn't point to somewhere else to look. I guess I'm saying it's not my knowledge that doctors have some requirement that the bill be something more than saying, you know, you came to Dr. X on such and such a date, please pay $100. As opposed to, let me tell you all about what we noticed about you, your arms and your legs and your heart. Oh my gosh, la la la. Why does that have to be in the bill? I'm not aware of a generalized requirement either, Your Honor. There are certainly some statutes in specific contexts that require clean claims in order for you to invoke the protections of those statutes. This is not one of them. The Congress knows how to write a clean claim statute. They didn't write that here. They wrote a statute that started a long process already. I mean, what I'm saying is there may be doctors that write you something in more detail, but there are definitely doctors who just send you what looks like a bill to me, just like when I get my gas bill and my electric bill and all of that. And as far as I know, they're not violating any law just by doing that, Your Honor. So the other issue that, Your Honor. And I'm not wrong on that, am I, that doctors do that? In my experience, yes, Your Honor. I'm not sure of anything in the record suggesting otherwise. Okay. All right. Now, I mean, air ambulance providers provide more detailed bills because they do want to get paid because it's important to their, obviously, to their business. They generally- Well, they're a little bit unusual. I appreciate them, but I'm hopeful that we don't all need an air ambulance in our lives. Most of us, God willing, will not need an air ambulance. But my clients can't even present a bill to an IDR to get the system started. I'm sorry, they can't present a claim to the IDR to get an IDR process started without sufficient information. That's plenty of protection for the insurers in these cases. We just need to get the time started. I just want to mention that if the 30 days begins with whatever the bill is, incomplete or not, if it's sent out for payment and the 30 days begins there, when that calendar runs and more information is needed, that is done through the negotiation process. Is there no middle ground? It does seem to me that that's some pretty heavy lifting for what might be a simpler task to provide some additional information. If it's a simple task, Your Honor, then the insurer, if they truly don't have sufficient information to determine that they owe the money or owe any money or owe a certain amount of money, at the end of the 30 days, 30 calendar days, they can submit a denial and explain in that denial, we don't have this information, so we don't believe we owe you any money. Then there's another negotiation period during which we have every incentive to provide them with that information. And if we fail to do that, then we likely will lose in front of the IDR and the arbitration. The other issue that I'm here to talk about is the single case agreements. The government, in the original administrative proceedings, provided a very simple explanation for why they excluded singular case agreements. They said in the rule that those were not contracts, just through pure executive fiat. They said that solely for purposes of calculating the QPA, a singular case agreement is not a contract. Is that the issue that was addressed in the district DC case? That is one, yes, that issue was addressed in the DC case, yes, Your Honor. Now at this point, they're no longer arguing they're not a contract. They're arguing it's not a rate, for instance. But if you look at, even the government can't help but use the word rate in the same way that we do, which is the amount paid pursuant to a single case contract, single case agreement, is a rate. If you look at page 37 of our brief, we block quote from the July rule, a place where they use the word in that manner. And the word rate is commonly understood to be the amount paid for a particular service. The other, they also point to the word under, but the government concedes that if they choose to enter into single case agreements under a particular plan with a particular provider, then those agreements are by definition covered by that plan for that particular insured party. And the reason it matters is the exact reason my colleague was saying, because if you don't include those, that was the majority of the market. That's the majority of the market back in 2019. If those aren't included, then it is hugely distorted what the QPAs will be for air ambulance services. Thank you, Your Honors. Do you want to respond to that single case argument? Sure. I would start with single case. I would say both first pointing to the D.C. District Court decision, I think that looks at the entire phrase that Congress used and found that the natural understanding is that the same one that the departments gave, which is a rate under a particular plan, is a rate under its generally applicable terms available to the beneficiaries of the plan. It's not this one-off agreement for conceivably out-of-network service. And just on the notion that this distorts the market, I mean, I don't think it's seriously disputed that one of Congress's goals in enacting the No Surprises Act is to address the market failure of certain providers being able to issue surprise bills and then balance bill patients if the insurer didn't agree to cover the amount of the bill. That is the problem that Congress was designing the statute to address with air ambulance providers being some of the ones most likely to send quite large bills with the leverage of balanced billing in their negotiations with insurers. That's reflected in the rule and some of the legislative history before Congress as well. I don't want to tell you how to speak, but I don't think you had an opportunity to discuss the bonus and incentive issue in the last argument, and I don't think you had an opportunity to address what was compelled in the circuit. Sure. I guess just on VACADOR, I think that's easy because certainly my friends are not arguing that they're actually asking for remand without VACADOR. So one of the other issues that we haven't discussed, it is an available remedy to remand without VACADOR under this Court's case law, and we do think the disruption associated with recalculating the QPAs and the importance of the QPA under the statutory framework both support that remedy here. On the bonus issue, textually, this again flows from the fact that it's the rate for a particular service. The notion that the Department didn't sort of make the point that these rates are not usually assigned to a particular service is just not right. That's at page 36894 of the rule. It notes that you frequently see these bonuses in a situation in which you have either bundled payments where a provider or facility is getting an amount of money for a bundle of services. Maybe they're just getting a flat fee for a particular patient. None of that is easily translated to this particular retrospective adjustment can be tied to this particular service. I think the amicus briefs from the America's Health Insurance Plans and the Blue Cross have some helpful examples of how these kind of bonuses actually operate in practice. And I think it's just fundamentally, it's a methodological determination for the departments to make that if that is the general way in which these sort of adjustments are made, they can design a rule that reflects that reality. They don't have to design a rule to the exceptions of a situation in which you might actually be able to tie a particular bonus to a particular service. I think that that sort of methodological determination is expressly delegated to the departments here by Congress. Just on the requirement that the departments have to adopt some sort of methodology to look not just at the contracted rates, but whether a particular claim has been paid. The notion that you can get just textually get two requirements out of the single phrase is provided by a provider in the same or similar specialty. I just, I don't think that works textually. I didn't hear either of my friends address the fact that the statute calls for this calculation to be based on a single snapshot in time, which does not let you either, it doesn't give you any sort of guidance about the period of which we're supposed to look whether a claim has been paid or not. As again, the Blue Cross brief shows, it's just whether a particular provider performs a particular service in one year, they might perform it in one year, they might not perform it the next. That happens all the time. They might provide it for one insurer, but not provide it for the other. And if you're Blue Cross, you have no idea if that same service was provided to Aetna or not. They're asking the insurers to take on this extremely burdensome inquiry that's not called for by the statute. And again, you can't square with the fact that the statute's asking for a single snapshot in time. And that same structural logic forecloses the idea that these case-specific agreements can be taken into account. Because my friends reasonably note, it doesn't make any sense to think you just take whatever case-specific agreements happen to be in place as of like January 31st, 2019, and otherwise they just kind of throw their hands up and say that maybe the departments can figure out some range of time. All right, counsel. Thank you. Thanks to all counsel. You have left us with a lot to consider. We'll take the case under advisement. We also will take a brief recess.